IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CRST VAN EXPEDITED, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-04-651-F |
| | ) | |
| J.B. HUNT TRANSPORT, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER ON
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I.    Introduction

By this order, and the related injunctive order[1] entered concurrently with this order, the court **GRANTS** plaintiff's motion for preliminary injunction (doc. no. 108 – "Motion").

The Motion was filed on October 18, 2005.  After thorough briefing, the Motion came on for evidentiary hearing on November 21 and 22, 2005.  As directed by the court, the parties filed their post-hearing briefs on December 30, 2005.  The matter is now ripe for decision.  In this order, the court will state its findings of fact and conclusions of law as required by Rule 52(a), Fed. R. Civ. P.  This order will also set forth the reasons for the court's grant of preliminary injunctive relief, as required by Rule 65(d), Fed. R. Civ. P.

---

[1] Doc. no. 162.

II.     Factual background

A.      The parties and their business.

CRST Van Expedited, Inc. ("CRST"), based in Iowa, and J.B. Hunt Transport, Inc. ("Hunt"), based in Arkansas, are in the long-haul trucking business – albeit in slightly different segments of that business.   Both companies are substantial enterprises, although Hunt is considerably larger than CRST.   CRST's primary business is hauling loads of high value freight over long distances on an expedited basis, *e.g.* coast to coast in 60 hours.   To this end, CRST's drivers, unlike Hunt's, typically drive in teams, two to a truck, so that the trucks can travel long distances with minimal interruptions.   In contrast, Hunt operates primarily with solo drivers. The two companies compete at least as much for drivers as they do for freight customers.

B.      The driver shortage.

The parties agree that there is a nationwide shortage of over the road truck drivers.   Entry into the long-haul truck driving labor force requires the aspiring truck driver to earn a commercial driver's license, successfully complete additional training, and survive other screens mandated by law or company policy.   The driver shortage has existed for a considerable period of time and is expected to continue well into the future.   In the context of this case, the nationwide driver shortage is best understood in light of the fact that Hunt has approximately 11,000 drivers and an annual driver turnover rate of approximately 150%.   Hunt, accordingly, has to hire an average of more than 300 drivers each week.   CRST, with approximately 2,800 drivers, has an annual turnover rate of approximately 180%, which means that CRST must hire, on the average, nearly 100 drivers each week.   Both companies devote substantial resources to driver recruitment.   CRST employs approximately 20 recruiters; Hunt employs approximately 160 recruiters, of whom 80 are "inside recruiters."   Hunt

employees who are not recruiters are also encouraged (and, in some instances, paid) to assist with Hunt's overall corporate recruiting effort.

     C.    <u>CRST's claims and Hunt's response</u>.

To meet its need for drivers, CRST relies predominantly on its driver training program. In this program, CRST trains over the road truck drivers "from scratch," paying for their commercial driving school, their orientation program with CRST, and their "finishing program" with CRST. CRST asserts that this approach enables newly-hired and inexperienced drivers to obtain the skills and certifications necessary to become over the road truck drivers without having to pay the cost of training, which would be prohibitively expensive for many candidates. In exchange for bearing the training costs for new drivers, CRST requires its drivers to enter into employment contracts under which (as is discussed in more detail below) the newly trained driver agrees to continue to drive for CRST for a specified minimum period of months at a rate of pay that allows CRST to recoup some of its outlay for training the driver.

In this action, CRST complains that, although it has taken pains to put Hunt on notice, often on a driver-by-driver basis, of its existing contractual relationships with its drivers, Hunt aggressively recruits and hires CRST-trained drivers without regard to whether the driver is in the primary term of his employment contract (and, in some instances, undeterred by actual knowledge that a particular driver is within the primary term of his employment contract). CRST asserts that this continuing course of conduct amounts to tortious interference with CRST's contracts with its drivers under Arkansas law, which CRST asserts to be the appropriate source of law governing its interference claim. CRST's position is that its drivers who have completed the primary term specified in their employment contracts are fair game for Hunt's recruiters, but that Hunt's persistent hiring of drivers known to Hunt to be within the

primary term of their employment contract with CRST amounts to tortious interference which should be enjoined.

In response, Hunt asserts, first, that there is no contractual relationship with which to interfere because, under the law governing the contracts (as distinguished from the tort claim for interference) – the law of California, Iowa, Oklahoma or Pennsylvania, as stated in the various versions of the contracts – the contracts between CRST and its drivers create nothing more than at-will relationships. Hunt also asserts that the CRST contracts contain covenants not to compete which are unenforceable and that, in this action, CRST impermissibly seeks to achieve indirectly a result which it knows it cannot achieve directly, *viz.*, enforcement of unenforceable non-compete provisions in the guise of injunctive relief prohibiting Hunt from interfering with the contractual provisions establishing a primary term of employment. Hunt further asserts that even if the CRST contracts are not merely agreements for employment at will, and assuming that the contracts are otherwise enforceable, Hunt's recruiting practices amount to tortious interference only if they are improper in the sense of being *independently wrongful*, *e.g.*, effected by way of threats, violence, trespass, defamation, misrepresentation, restraint of trade or other clearly illegal means. In response to this point, CRST argues that this stringent definition of "improper" conduct does not apply where a party interferes with an *existing* contract and that, in any event, the authorities relied upon by Hunt are distinguishable.

Hunt further asserts that, if, as urged by Hunt, the tortious interference claim is governed by Iowa law, CRST must both satisfy the heightened "improper" conduct requirement and establish that Hunt acted for the sole and predominant purpose of injuring or financially destroying CRST. Finally, with respect to CRST's request for injunctive relief, Hunt asserts that, aside from the substantive issues, CRST has an adequate remedy at law, that the harm which preliminary injunctive relief would

inflict on Hunt outweighs the injury claimed by CRST, and that the public interest favors denial of injunctive relief.

      D.    <u>Driver recruitment and training</u>.

      As has been discussed, CRST relies predominantly on its training program as a source of new drivers. About 70% of CRST's drivers come to the company as raw recruits, with no commercial driver's license or training as over the road truck drivers. About 10% of CRST's hires come to the company with a commercial driver's license and have completed truck driving school. Another 20% of CRST's hires are experienced drivers. CRST spends well in excess of $1 million each year advertising for drivers. Nevertheless, CRST has experienced a shortage of drivers, as has the rest of the over the road trucking industry, including Hunt. The result of this, for CRST, is that CRST has had to turn away business for lack of drivers.

      CRST's driver training program is structured to attract new hires who would not otherwise have the financial ability to get the necessary training. CRST pays the cost of commercial driving school for the would-be over the road driver. After completion of driver training school, the student attends orientation at CRST. After completion of the orientation, the student driver signs a contract and trains with a lead driver for about 28 days.

      Approximately 70% of the students who start commercial driving school will complete that phase of their training. From that 70%, there is further attrition by way of drivers who do not complete orientation, do not pass a road test, or leave during or immediately after the month of driving with the lead driver. The net result is that about 40% of the drivers who start the training process actually remain on the job as drivers at the conclusion of the process. CRST's costs for driving school range from $3,000 to $6,000 per recruit.

In order to enhance its prospects for retention of drivers whose training was paid for by CRST, CRST began, in the fall of 2003, to require drivers who were trained at its expense to enter into written employment contracts with CRST. The employment contract is signed by CRST and the driver on the last day of orientation. By their terms, the various forms of contract are governed by the law of California, Iowa, Oklahoma or Pennsylvania, those being the four states in which driver orientation has taken place. The forms of contract used at various times provide for an initial fixed term of employment (referred to in this order as the primary term) of six to twelve months. Relatively few of the contracts provide for a twelve month primary term; most provide for a six month or eight month primary term.[2]

Taking an employment contract between CRST and Nicolae Patrascu, dated December 12, 2004 (CRST ex. 32) as an example, the contract provision for the primary term of employment is expressed as follows:

> 3. <u>TERMS OF EMPLOYMENT</u>. The term of CRST's employment of Employee under this Contract shall be for a period of six (6) months commencing as of the Effective Date subject to termination for Due Cause by CRST prior to the end of the term pursuant to Section 4 of this Contract. CRST's employment of Employee after this six (6) month period shall be at will and may be terminated at any time by either CRST or Employee. Employee acknowledges that CRST has made a substantial investment in Employee's driver training and that CRST would be damaged by Employee's failure to complete the term of this contract.

The contract provides for termination with or without "Due Cause," within or after the expiration of the primary term of employment as follows:

> 4. <u>TERMINATION OF EMPLOYMENT</u>. During the six (6) month term of this Contract CRST's employment of Employee may only

---

[2] Legal issues relating to the contract provisions for a primary term of employment are discussed in part III(C), below.

be terminated for the following reasons: (1) by CRST for Due Cause, effective immediately, (2) by mutual agreement of CRST and Employee, and (3) upon the death of Employee.  For the purposes of this Contract, "Due Cause" means Employee's breach of this Contract and/or Employee's failure to satisfy or comply with any of the standards, requirements, obligations and conditions set forth in the Handbook. Additionally, CRST may terminate the Employee's employment without Due Cause during the life of this Contract.  If Employee is terminated without Due Cause, under that circumstance, Employee is forgiven for the amount due under paragraph 8 and the terms of paragraph 5 shall be deemed null and void.

The driver contracts also typically include a limited non-competition provision. Although, as is discussed in note 8, below, the non-competition provision is of limited relevance to the issues in this case, the restrictive provision in the exemplar contract under examination provides as follows:

5.   RESTRICTIVE TERM.  Employee acknowledges that the services Employee is to render to CRST is the result of CRST's making a substantial financial commitment to the Employee for Employee's driver training, and that CRST is entitled to recover the driver training investment during the Employee's continued employment for a six (6) month period.  Employee further acknowledges that CRST's failure to recover the substantial investment in driver training cannot adequately be compensated by damages in an action at law.  In view of the value to CRST of Employees [sic] services and the competitive disadvantage Employee could cause, Employee agrees that while Employee is employed by CRST and during the Restrictive Term after Employee's employment with CRST has terminated for any reason, with or without cause, by Employee, or terminated with Due Cause by CRST, Employee will not, directly or indirectly provide truck driving services to any CRST motor carrier competitor.  A competitor means any motor carrier, common or contract, that provides a service offered by, similar to, competitive with or which can be used as an alternative to the services offered by CRST, during the time Employee worked for CRST.

The Restrictive Term shall expire at the expiration of the life of this Contract, unless within the six (6) month period covered by this contract, the amount due as defined in paragraph 8 is paid in full. If any of the foregoing events occur, there shall be no compensation paid to Employee during the Restrictive Term. If CRST terminates Employee's employment without Due Cause, this Contract shall be null and void.

Finally, the contract calls for reimbursement of "some of the significant sums of money that CRST has invested to train employee" in the event that, during the primary term, the driver breaches the contract or is terminated for due cause, as follows:

8. <u>REIMBURSEMENT OF AMOUNT DUE</u>. Employee hereby agrees that if during the six (6) month term of this Contract (1) Employee breaches this Contract, or (2) Employee's employment is terminated for Due Cause, then the total amount of $3,600.00 will be immediately due and payable by Employee to CRST. It is the intent of the parties that Employee's compliance with the terms of this Contract permits CRST to recoup some of the significant sums of money that CRST has invested to train Employee to perform the driver duties required under this Contract, in the event Employee breaches this Contract or is terminated for Due Cause during the six (6) month term of this Contract.

On October 20, 2003, which was at or shortly after the time CRST started requiring its student drivers to sign employment contracts, David L. Rusch, president of CRST, notified Hunt of its driver contract arrangements by way of the following letter to Kirk Thompson, chief executive officer of Hunt:

As you are aware, CRST invests significant amounts of money in training individuals to become professional truck drivers. Those expenses include, but are not limited to, driving school tuition and those incurred in the CRST finishing school.

Your company, in the past, has solicited our first year drivers in your attempt to avoid those training costs. This has caused a financial burden

on CRST.  To protect our investment, we are now requiring the student drivers to sign a one-year employment contract, which allows CRST to recoup the expenses incurred in training these individuals.

The purpose of this letter is to put you on notice that any interference with this contractual relationship, by hiring those drivers who are under a one-year employment contract with CRST, will be deemed your company's interference with that contractual relationship.  If your organization persists on using CRST as a new Driver Recruiting source, you will be required to reimburse CRST for its training costs.  CRST will take the appropriate legal action to enforce its rights.

If you need further clarification regarding the intent of this letter, please feel free to contact me.

CRST ex. 9.

Hunt's approach to driver recruitment and training is best understood by examining Hunt's corporate policies and then examining how those policies are implemented.

Alfred Craig Harper is Hunt's chief operating officer.  He has been with the company since 1992.  He has served as chief operating officer since 1997.  At the preliminary injunction hearing, CRST called Mr. Harper as a witness by presenting his video deposition, and Hunt called Mr. Harper as a live witness.[3]

As early as 1996, Hunt had developed an extensive program to attract, train and retain drivers.  Tr. at 35 and 36.  Hunt used to have a formal driver training program,

---

[3]  The deposition testimony of Mr. Harper which was presented by CRST is evidenced by the transcript which is marked as court's exhibit no. 1.  Because Mr. Harper's testimony has a direct and significant bearing on the court's evaluation of the issues before it, Mr. Harper's testimony is cited by page number from the deposition transcript (court's exhibit no. 1), or from the hearing transcript, where appropriate.  In those instances in which the court cites the hearing transcript (not to be confused with the transcript of Mr. Harper's deposition testimony), the court will cite the November 21, 2005 transcript as "Tr. I" and the November 22 transcript as "Tr. II."  The deposition transcript (Court Ex. No. 1) is cited simply as "Tr."

but both of the company-owned driver training centers were closed in 1996, as a cost savings measure. Tr. at 45. Although Hunt does pay for the training of "a small number of drivers currently," Hunt now has no driver training schools. Tr. at 136. The number of drivers Hunt trains is very small in relation to its hiring needs. As explained by Mr. Harper: "I believe the last number I heard was we had nine go through the [training] class." Tr. at 170. For these reasons, Hunt's "main focus" is to hire experienced drivers. Tr. at 168.

Hunt's recruiting of experienced drivers is accomplished mainly through the efforts of its recruiters. Hunt has approximately 80 "inside recruiters." The inside recruiters "must make at least 200 calls per day," which would amount to 16,000 calls per day, and 80,000 calls per week, for the 80 inside recruiters. Tr. at 96, 98; CRST ex. 10, at JBH 159. These recruiting calls are calls in which the recruiter "reach[es] out to speak to a driver about the driving opportunity at J.B. Hunt." Tr. at 96-97.

In his live testimony, Mr. Harper estimated that Hunt's recruiting efforts are directed to drivers for companies based in "all 48 states." Tr. I at 205.

Hunt's recruiters are given specific instructions in Hunt's remarkably detailed recruiting manual (CRST ex. 10) as to what they must do when they contact a driver either directly or on the telephone. Tr. at 102. The recruiters are expected to find out how much experience the driver prospect has. Tr. at 123. Hunt recruits drivers from hundreds of companies. Tr. at 123.

The dialogue between the recruiter and the driver prospect is carefully scripted into a series of prescribed questions designed to result in the "perfect presentation." Tr. at 104-105; CRST ex. 10, at 9 (JBH 137). The prescribed questions include an inquiry as to how long the recruit has been driving for his present employer. Tr. at 107-08. The dialogue prescribed in the recruiting manual for the conversation between the recruiter and the driver prospect is not framed so as to elicit information

about whether the recruit is under contract with his current employer. Tr. at 108. Mr. Harper's testimony made it clear that, in recruiting, Hunt's sole concern is "being sure that every safe driver out there has the opportunity to work for a better paying company in a safe operation such as ours." Tr. at 108.

Mr. Harper has either seen the October 20, 2003 letter from Mr. Rusch, of CRST, to Mr. Thompson, of Hunt, or he has seen "documents similar to this." Tr. at 75. As of October, 2003, when Mr. Rusch's letter was sent to Mr. Thompson, Mr. Harper was the Hunt employee who had principal responsibility for recruiting. Tr. at 75.

Mr. Harper acknowledged that the October, 2003 letter effectively informed Mr. Thompson, Hunt's CEO, that CRST was requiring its student drivers to sign one-year employment contracts. Tr. at 79-80. As for Mr. Harper's personal knowledge, in his capacity as the Hunt employee with primary responsibility for recruiting, he acknowledged that as early as October of 2003 he was aware that CRST had employment contracts with its first-year drivers. Tr. at 80. Thus, he was also aware of CRST's position that Hunt's hiring of CRST's first-year drivers "will be deemed your company's interference with that contractual relationship." Tr. at 80. Hunt's receipt of Mr. Rusch's letter did not result in any change in Hunt's practices. Tr. at 82, 103.

CRST sought to fortify its notification to Hunt of its contractual relations with its drivers by sending written notification to Hunt in those instances in which, as required by federal regulations, Hunt inquired of CRST as to the driving record of a CRST driver being recruited by Hunt. Plf. Ex. 22. These letters are not all identical, but a March 5, 2004 letter to Hunt from Scott Randall, CRST's director of safety, is representative:

11

The below-named individual executed a one-year contract with CRST which is in effect. By providing you with information pursuant to Title 49 Code of Federal Regulations, CRST is not waiving that one-year contractual commitment. Please be informed that we intend to pursue all available legal remedies to enjoin any party from interfering with our efforts to enforce the terms of this agreement.

We will confirm only the information referenced below. If you have any questions about this matter, you may refer them to me in writing.

One hundred forty-eight of these letters are in evidence, all dated in 2004 and 2005. Mr. Harper routinely saw these letters. Tr. at 146. He acknowledged that they come in "quite frequently." Tr. at 147.

Mr. Harper maintained that, under Hunt's standard recruiting procedures, the recruiter would not know that the driver-recruit is under contract with another company. "That's really of no concern of ours. It's really the concern between CRST and the driver." Tr. at 118. This is borne out by other evidence received at the hearing. Terry Reagle, a training driver employed by CRST, testified, credibly, that, in June, 2004, a Hunt recruiter aggressively sought to recruit a CRST trainee at a truck stop, and that the recruiter's ardor increased when he learned about the trainee's status as a student. Tr. I at 116 - 118. Hunt also seeks to recruit CRST trainees by cold-calling the pay telephone in CRST's driver trainee lounges. *Id.* at 118 - 20. Mr. Harper acknowledged that, as a matter of policy, Hunt has chosen not to inform its recruiters of CRST's objections to Hunt's recruiting of CRST's contract driver trainees. *Id.* at 193 - 94. A contemporaneous record of a Hunt recruiter's calls to a CRST contract driver in early 2005 shows, accordingly, that the Hunt recruiter was undeterred after bring informed by the driver that he was "under contract with CRST b/c he went to school with them." CRST ex. 23 (JBH 1129). This is consistent with

the experience of CRST driver Gregory Flores, who was told by a Hunt recruiter that "there's nothing [CRST] can do about it really" if he disregarded his contract with CRST.  Tr. I at 94.

Hunt's efforts to recruit CRST drivers have resulted in Hunt's hiring, between January and November of 2005, of more than 200 CRST drivers who were still in the primary term of their employment contract with CRST, the vast majority of whom started with Hunt in the month they left CRST or the month after that.   These numbers standing alone do not, of course,  prove the cause of the departure of each individual driver, but, in the aggregate,  they provide persuasive evidence of the success of Hunt's efforts to recruit CRST drivers without regard to the status of their contracts with CRST.

Mr. Harper's most cogent and persuasive description of Hunt's approach to driver recruiting was articulated as follows:

> Q.     Is it your testimony that J.B. Hunt permits its recruiters to try to persuade – to try to persuade CRST contract driver trainees to stop working for CRST and start working for J.B. Hunt instead?

> A.     It is my testimony that our recruiters would talk to any and all drivers that they come in contact with by phone or at rest stops to let them know about our job and offer them the opportunity to come to work for J.B. Hunt.

> Q.     And is it your testimony that that is okay with J.B. Hunt regardless of whether the CRST driver is under contract with CRST?

> A.     There is – that's a relationship between CRST and the driver.  Again, what we are after is being sure that every driver in America knows that they have an opportunity to come to work for what many would say is the safest truckload carrier in the United States of America and can provide a living for their family and not accept lesser wages.

Mr. Harper made it clear that the contract status of the recruit is irrelevant:

> Q.     So that [increase in pay per mile] would apply to a three-month driver making 26 cents per mile as a driver trainee under contract with CRST, as well; correct?
>
> A.     It would apply to any three-month driver they come into contact with.
>
> Q.     That would include a CRST contract driver?
>
> A.     Yes.  As I say, any driver they come into contact with.

Mr. Harper gave lip service to the fact that CRST drivers might "have some obligation that they need to fulfill." Tr. at 152. After the court commented on some of the inferences it draws from Mr. Harper's plainspoken testimony (Tr. II at 22), counsel for Hunt pointed out a passage from Mr. Harper's deposition testimony that had not previously been presented:  "We would expect them, like everybody, to, you know, honor whatever your obligations are."  Tr. at 119, pointed out at Tr. II at 32 - 33.  The evidence establishes that this expectation, if it exists, is not translated into action by Hunt and does not manifest itself in Hunt's recruiting practices or in its remarkably detailed recruiter training materials.  Mr. Harper's testimony as to what Hunt actually does clearly establishes that Hunt's recruiting efforts with respect to CRST drivers are not, and are not intended to be, affected by whether the CRST driver is still within the primary term of his contract with CRST.  Mr. Harper maintained that it would not be desirable for Hunt to cease hiring drivers who are under contract with CRST because "you're limiting the free trade in America, the free will of people to choose who they want to go to work for and when they want to go to work for them."  Tr. at 156.  "It looks like they're an indenture [sic] servant versus having the right to pick and choose where to go to work."  Tr. at 157.

Hunt intends to continue this approach to recruiting.  Tr. at 162 - 63.

III.    Analysis, discussion and conclusions of law[4]

A.    Jurisdiction.

CRST is an Iowa corporation.  Its principal place of business is in Iowa.  Hunt is a Georgia[5] corporation; its principal place of business is in Arkansas.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  Although the court may determine whether the requisite amount in controversy exists by looking to all of the relief sought in the action, the court need not, in this case, look further than to the injunctive relief to determine with confidence that, from the point of view of either the plaintiff or the defendant (*e.g.*, value of the injunctive relief sought or negative impact of the injunctive relief sought), the amount in controversy requirement is satisfied.  *See* Oklahoma Retail Grocers Assoc. v. Wal-Mart Stores, Inc., 605 F.2d 1155, 1159 (10th Cir. 1979); and Ronzio v. Denver & R.G.W.R. Co., 116 F.2d 604, 606 - 07 (10th Cir. 1940).  The court has subject matter jurisdiction under 28 U.S.C. § 1332.

B.    Choice of Law.

The court is required in this action to make two separate choice of law determinations.  The determination of whether Hunt's recruiting practices are tortious may be determined by the law of Arkansas or Iowa or perhaps another state.  That must be determined by the court.  Secondly, the issues now before the court require

---

[4]  This portion of this memorandum also includes some findings of fact as to matters which directly relate to the conclusions of law.

[5]  In 2004, CRST filed suit in Iowa against Hunt's parent company, J.B. Hunt Transport Services, Inc. (see note 6, below).  That parent company was recited in that case to be an Arkansas corporation.  In the case at bar, the fact that J.B. Hunt Transport, Inc. (not to be confused with J.B. Hunt Transport Services, Inc.) is a Georgia corporation is not in controversy.  As to the factual basis for diversity jurisdiction in the case at bar, see doc. no. 160.

15

the court to determine the legal effect of some provisions of CRST's driver contracts, which, by their own terms, are governed by the law of California, Iowa, Oklahoma or Pennsylvania, as the case may be.

The court will first address the choice of law issue as to plaintiff's tort claim.

      1.    <u>Choice of law as to plaintiff's tort claim</u>.

In this diversity action, the court's choice of law determinations are governed by Oklahoma's conflicts of laws rules.[6]

<u>Brickner v. Gooden</u>, 525 P.2d 632 (Okla. 1974), ushered in a new era in Oklahoma law with respect to choice of law in tort cases. In <u>Brickner</u>, the Supreme Court of Oklahoma embraced the principle that, in a tort case, the court should apply the local law of the state which has the most significant relationship to the occurrence and the parties. The court adopted, virtually verbatim, the formulation set forth in the Restatement (Second) of Conflict of Laws § 145 (1971):

> We hold, as a general principle, that the rights and liabilities of parties with respect to a particular issue in tort shall be determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties. The factors to be taken

_____

[6] In <u>CRST Van Expedited, Inc. v. J.B. Hunt Transport Services, Inc.</u>, case no. C-04-79 in the United States District Court for the Northern District of Iowa (the "Iowa case"), the court entered an order on July 30, 2004 ("Iowa order") with respect to CRST's unsuccessful application for a temporary restraining order against Hunt. The Iowa order is document no. 39 in that case. (No subsequent orders addressing the merits of CRST's claims in that case were entered by the Iowa court.) On page 7 of the Iowa order, the Iowa court said that: "Because the court has diversity jurisdiction over this case under 28 U.S.C. § 1332, the substantive law governing CRST's claims is Iowa law." The court proceeded to analyze the matter under the Iowa law of tortious interference with contracts and intentional interference with prospective business advantage. *Id.* at 7-9. Because the Iowa court cited <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938) for the passage just quoted, it appears that that court determined that the "substantive law governing CRST's claims is Iowa law" because that was the law of the forum. However, under <u>Klaxon Co. v. Stentor Electric Manufacturing Co.</u>, 313 U.S. 487, 496 (1941), a federal district court, sitting in diversity, must apply the *conflict of laws rules* of the forum state in order to determine what state's substantive law applies. Thus, *Erie* mandates the application of state law, but does not determine what state's law controls.

into account and to be avaluated [sic] according to their relative importance with respect to a particular issue, shall include:

(1)    the place where the injury occurred,
(2)    the place where the conduct causing the injury occurred,
(3)    the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(4)    the place where the relationship, if any, between the parties occurred.

525 P.2d at 637.

The court, in <u>Brickner</u>, made note of the fact that Restatement § 145 incorporates the choice influencing principles set forth in Restatement § 6, but did not quote from or analyze Restatement § 6. Any question as to whether Restatement § 6 arrived in Oklahoma hand in hand with Restatement § 145 was answered in <u>Beard v. Viene</u>, 826 P.2d 990 (Okla. 1992) and again in <u>Ysbrand v. DaimlerChrysler Corp.</u>, 81 P.3d 618 (Okla. 2003). In <u>Ysbrand</u>, the court (resolving a conflicts issue under the Uniform Commercial Code) adopted Restatement § 6 essentially verbatim as follows:

Under <u>section 6</u> of the Restatement, the factors relevant to any choice of law decision include:

(a)    the needs of the interstate and international systems,
(b)    the relevant policies of the forum,
(c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d)    the protection of justified expectations,
(e)    the basic policies underlying the particular field of law,
(f)    certainty, predictability and uniformity of result, and
(g)    ease in the determination and application of the law to be applied.

81 P.3d at 625. This reliance on the Restatement § 6 principles echoed the court's citation and quotation from those principles in <u>Beard</u>. *See* <u>Beard</u>, 826 P.2d at 995, n. 18. Accordingly, the court agrees with the parties that the principles stated in §§ 6

and 145 of the Restatement, applied as the court would conclude they would be applied on these facts by an Oklahoma court, control the court's choice of law analysis with respect to CRST's tort claim. *See* CRST brief (doc. no. 159, herein: CRST brief), at 1; Hunt brief (doc. no. 158, herein: Hunt brief), at 2-3.

As Professor Leflar has pointed out, "[t]he greatest single danger in the use of a 'center of gravity' test is that it will descend to a mere counting of factual contacts, to see which state has the most." Leflar, <u>American Conflicts Law</u>, at 330 (Bobbs-Merrill, 1968). Both Leflar and common sense counsel against such a mechanical approach: "If emphasis is on the significance of the contacts, a court may well conclude that one important contact outweighs a half-dozen lesser ones." *Id.*

This is a dispute between two businesses. As a practical matter, CRST seeks in this case to regulate Hunt's conduct. The focus is on Hunt's conduct. As noted above, on page 10, Mr. Harper estimated that Hunt's recruiting efforts are directed to drivers for companies based in 48 states. Thus, as acknowledged by Hunt, "the contacts at issue in this case are scattered and encompass conduct that reaches to arguably all 48 contiguous states." Hunt brief, at 4 (n. 2). Iowa is but one of those 48 states. It is essentially fortuitous that the party seeking to regulate Hunt's conduct is from Iowa. If we recognize that this case is quite analogous to an unfair competition case, it follows that Restatement § 145 "suggests that the most significant factor is not the place of injury, as in personal injury cases, but the place of the defendant's conduct." Scoles, et al., <u>Conflict of Laws</u> (Thomson West 4th Ed. 2004), at 870. *Cf.*, <u>Pony Computer, Inc. v. Equus Computer Systems of Missouri, Inc.</u>, 162 F.3d 991, 995-96 (8th Cir. 1998); and, comment f to Restatement § 145.

Application of the four factors set forth in Restatement § 145 provides little firm guidance in determining what state's law should apply to CRST's tort claim. However, Restatement § 6, augmenting Restatement § 145, provides considerably

more guidance.  Turning first to § 145, it is arguable that "the place where the injury occurred" was either Iowa or a multitude of other states and that "the place where the conduct causing the injury occurred" was either Arkansas or a multitude of other states.  To the extent that these two factors favor the application of the law of any one state, they do not favor application of Iowa law:  "When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."  Restatement (Second) of Conflict of Laws § 145 cmt. e (1971).

The § 145 considerations of domicile, residence, nationality and place of incorporation have little impact on the court's analysis in this case.  Likewise, this case does not lend itself to analysis in terms of "the place where the relationship, if any, between the parties occurred."  Restatement § 145(2)(d).

Turning to the Restatement § 6 factors, the restatement's guidance, on the facts of this case, is more readily apparent.

As will always be the case, the facts now before the court invite the application of some § 6 factors more than others.  Taking into account the needs of the parties to this business dispute, the court concludes that the most relevant § 6 factors are (i) the needs of the interstate and international systems, (ii) the protection of justified expectations, (iii) the basic policies underlying the particular field of law, and (iv) certainty, predictability and uniformity of result.  These factors, individually and collectively, counsel strongly for the application of Arkansas law to the court's determination of whether Hunt's recruiting practices are actionable.

Hunt's recruiting practices are the product of policies which were formulated only in Arkansas and which are implemented in Arkansas to an extent vastly greater

than they are implemented in any other single state. Arkansas is the only state in which all of the activities which collectively make up Hunt's recruiting practices intersect. The result of the application of the law of the complaining party's state would be that Hunt's recruiters, making their thousands of calls each day, would be undertaking activities governed by the laws of dozens of states, if not all 48 contiguous states. If there has ever been any doubt that variations in state tort law might be relevant to the management of Hunt's recruiting practices, there surely is no room for any such doubt now. A recruiter for Hunt would be in an awkward position if he or she had to shape the recruiting talk to conform to the law of the state in which the employer of the prospect is located. Since the conduct that is the primary focus of this action is the multi-state conduct of an Arkansas company, directly affecting competitors based in numerous states, Hunt's recruiting operation can be governed by a consistent set of rules, yielding predictable results, only if the governing law is the law of the state where Hunt is headquartered. Viewing the matter in light of the overall business operations of these two parties, the application of the interference law of any state other than Arkansas in this case would be the result of circumstances almost wholly fortuitous. The court concludes that Arkansas law applies to plaintiff's tort claim.

    2.    <u>Choice of law as to the driver contracts</u>.

The parties agree that the choice of law provisions, designating California, Iowa, Oklahoma or Pennsylvania law, as the case may be, to govern the driver contracts, should be given effect. *See* CRST brief at 3 and Hunt brief at 2. The court agrees. *See* <u>Moore v. Subaru of America</u>, 891 F.2d 1445, 1449 (10th Cir. 1989); <u>Eakle v. Grinnell Corp.</u>, 272 F.Supp.2d 1304, 1308 (E.D. Okla. 2003).

C.   <u>Driver contracts: at-will or not</u>?

As has been noted, CRST's driver contracts provide for a primary term of employment, lasting 6 months or 8 or 12 months, as the case may be.  Taking CRST exhibit 32 as an example, the primary term provision states as follows:

> The term of CRST's employment of Employee under this Contract shall be for a period of six (6) months commencing as of the Effective Date subject to termination for Due Cause by CRST prior to the end of the term pursuant to Section 4 of this Contract.

Typically, the driver contracts go on to provide, in paragraph 4, that during the primary term of the contract, "CRST's employment of Employee may only be terminated" for "Due Cause" or by mutual agreement or as a result of the death of the employee.  *See* CRST ex. 18.  Due Cause is defined as "Employee's breach of this Contract and/or Employee's failure to satisfy or comply with any of the standards, requirements, obligations and conditions set forth in the [driver's] handbook."  *Id.* The contracts further provide that CRST may terminate the driver's employment without due cause but that, in that event, the employee is released from his obligation to repay the cost of his training and from the non-competition agreement set forth in paragraph 5.  *Id.*

Hunt asserts that "CRST's express reservation of the right to terminate its drivers at any time and for any reason vitiates any argument that the contracts are anything other than at-will."  Hunt brief, at 5.  If the primary term provisions of the driver contracts are indeed illusory, as asserted by Hunt, that might well affect the court's analysis of CRST's claim for interference with existing contracts and would raise serious issues as to the viability of other interference theories which CRST might

assert.[7]  However, the court does not agree with Hunt that the primary term provisions of the driver contracts are illusory.  CRST did not retain, as contended by Hunt, "unfettered discretion to terminate its drivers at any time for any reason."  Hunt brief, at 8.  Because the definition of "Due Cause" is specifically defined in terms of the employee's failure to comply with his own obligations and because termination without due cause produces specific contractual consequences for CRST, CRST's discretion to terminate its drivers is not unfettered.

Under the law of California, Iowa, Oklahoma and Pennsylvania, where an employment agreement provides for a specified term of employment, the employment relationship is not at will.  *See* California Labor Code § 2922 (West 2003) (must be at least one month); Lockhart v. Cedar Rapids Community School Dist., 963 F.Supp. 805, 820 (N.D. Iowa 1997); Burk v. K-Mart Corp., 770 P.2d 24, 26 (Okla. 1989); and Janis v. AMP, Inc., 856 A.2d 140, 144 (Pa. Super. 2004).

To remove this case from the unremarkable principle established by the foregoing authorities, Hunt asserts the equally unremarkable proposition that if one side or the other is free to terminate the employment without a good reason and with no adverse contractual consequence, the relationship must be treated as an at-will relationship.  *See* Hunt brief, at 6-8.  However, none of the authorities upon which Hunt relies involve situations in which termination of an employment relationship during a specified term carries specific consequences for the employer as is the case with the CRST driver contracts.  Granting that CRST has the *power* to terminate any employment relationship at any time (as is the case with any employer and any

---

[7]  Hunt's assertion about the at-will nature of the CRST contracts is the predicate for the assumption, woven through Hunt's brief, that CRST's claims must fail if the driver contracts create nothing more than at-will employment relationships.  Hunt cites no authority for this assumption.  It is worth noting at this point that this assumption is, in some respects, undermined by the commentary in the Restatement.  Restatement (Second) of Torts, § 766 cmt. f (1979).

employee, regardless of what the contract says), the question is whether CRST's *right* to terminate a driver contract is laden with consequences sufficient to avoid characterization of the primary term provisions as illusory.  On this issue, it is important to understand that in order to have a valid contract providing for employment for a specified term, the rights of the employer and the employee to terminate the relationship need not mirror each other.  As stated in Restatement (Second) of Contracts, § 79:  "If the requirement of consideration is met, there is no additional requirement of . . . (b) equivalence in the values exchanged; or (c) 'mutuality of obligation.'"  Restatement (Second) of Contracts § 79 (1979).  The California, Iowa, Oklahoma and Pennsylvania cases relied upon by CRST establish that this principle obtains in those four states.  *See* Foley v. Interactive Data Corp., 765 P.2d 373, 381, n. 14 (Cal. 1988); Collins v. Parsons College, 203 N.W.2d 594, 598 (Iowa 1973); Langdon v. Saga Corp., 569 P.2d 524, 526-27 (Okla. App. 1976); and Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1197-98 (Pa. Super. 1987).

The evidence before the court establishes that the hypothetical employee terminated by CRST without due cause is an individual who was, at CRST's expense, trained "from scratch" to become an over the road truck driver.  That process confers a substantial benefit on the newly-minted professional driver.  In return, for the purpose of protecting its investment in putting a new driver on the road, CRST contracts for the new driver's services for a specified term, during which it can fire the driver for due cause (consisting essentially of failure by the driver to comply with his obligations to CRST) or without due cause – on pain of forfeiting the right to recoup the sum specified in the contract as representing a portion of the cost of training the new driver.  CRST's contractual right of recoupment is not window dressing.  After Hunt hired Angela Chapman, a driver who had been recruited and trained by CRST, she came to an agreement with CRST to pay CRST approximately $2,000.  Tr. II at

23

216 - 17.  The court concludes that the correlative rights and obligations which are created by the driver contract provisions for a primary term of employment and for termination with or without due cause collectively establish a contract for a term of employment that is not at-will.

      D.    <u>Preliminary injunction standard.</u>

The parties are in agreement as to the basic standard governing the court's determination as to whether a preliminary injunction should be entered.  *See* CRST brief, at 29 and Hunt brief, at 29-30.  To obtain relief by way of a preliminary injunction, the plaintiff must establish that:

    1.     It has a substantial likelihood of prevailing on the merits,

    2.     It will suffer irreparable harm unless the injunction is entered,

    3.     Its threatened injury outweighs the harm to the opposing party, and

    4.     The injunction will not adversely affect the public interest.

<u>Prairie Band of Potawatomi Indians v. Pierce</u>, 253 F.3d 1234, 1246 (10th Cir. 2001).

Although Hunt agrees with the foregoing statement of the prerequisites to preliminary injunctive relief, Hunt asserts, in addition, that the injunction sought here is a "disfavored injunction" which carries a higher burden of proof.  Citing <u>Schrier v. University of Colorado</u>, 427 F.3d 1253 (10th Cir. 2005), Hunt asserts that the injunction sought here by CRST should be characterized as a *mandatory* injunction and that a mandatory preliminary injunction is, as stated in <u>Schrier</u>, 427 F.3d at 1258-59, a disfavored preliminary injunction which "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  <u>Schrier</u> at 1259, quoting from <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 977 (10th Cir. 2004) (*en banc*).

Hunt argues that the injunction sought by CRST in this case (specifically: "A preliminary injunction enjoining defendant J.B. Hunt from hiring drivers under contract with CRST," Motion, at 3), would be a mandatory injunction "because J.B. Hunt would be required to retrain its recruiting staff and admonish each and every recruiter and driver/recruiter about talking with a CRST driver." Hunt brief, at 31. The court does not agree that these steps which may be incident to compliance with a prohibitory injunction would convert the prohibitory injunction into a mandatory injunction. The mere fact that a defendant on the receiving end of an injunction would actually have to *do* something (in this case, implement routine administrative measures) in order to see to it that the prohibitory provisions of the preliminary injunction are not violated does not convert an essentially prohibitory injunction into a mandatory injunction within the meaning of <u>Schrier</u> or the cases cited therein. Moreover, Hunt protests too much – if the evidence at the hearing proved anything, it proved that Hunt is committed to tight management of its driver recruiting operation.

     1.    <u>Likelihood of success on the merits</u>.

The court's determination of whether CRST is likely to succeed on the merits of its interference claim turns, for the most part, on the question of whether, under Arkansas interference law, CRST has established that Hunt has interfered with (and, unless enjoined, will continue to interfere with) the provisions of CRST's driver contracts which establish a primary term of employment between CRST and the newly-trained and licensed driver. The court accordingly turns to an analysis of Arkansas interference law as applied to the facts of this case.

Although, as will be seen, there is more to Arkansas interference law than the four elements set forth below, the following four elements provide the beginning point for establishing interference with a contractual relationship under Arkansas law:

1.    The existence of a valid contractual relationship or business expectancy,

2.    Knowledge of the relationship or expectancy on the part of the defendant,

3.    Intentional interference inducing or causing a breach or termination of the relationship or expectancy, and

4.    Resultant damage to the party whose relationship or expectancy has been disrupted.

Walt Bennett Ford, Inc. v. Pulaski Co. Spec. Sch. Dist., 624 S.W.2d 426, 429 (Ark. 1981). *See also*, Mason v. Wal-Mart Stores, Inc., 969 S.W.2d 160, 163 (Ark. 1998). *Cf.* Stewart Title Guaranty Co. v. American Abstract & Title Co., ____ S.W.3d ____, 2005 WL 2562946 (Ark. 2005) (business expectancy case only – same elements but contractual relationship not required).

It is not enough to establish these four elements.  The interference, if it has occurred at all, must be "improper," a requirement which receives more attention later in this memorandum.   It is important to note at this point that the Arkansas interference cases rely heavily upon the exposition of interference law in the Restatement (Second) of Torts, §§ 766 and 767 (1979).  The cases are replete with citations to and quotations from the black letter language of the Restatement, as well as the comments.  *See, e.g.*, Baptist Health v. Murphy, ___ S.W.3d ___, 2006 WL 242670, Part III (C) (Ark. Feb. 2, 2006) (publication pages and star page references not available) and Mason, 969 S.W.2d at 164 - 65.

As to the first element, the existence of a valid contractual relationship, the court has determined (*see* pp. 21 - 24, above) that the CRST driver contracts did

validly provide for a fixed primary term of employment.[8]  Thus, there were (and are) valid contracts which could be adversely affected by the conduct of a third party.[9]

The second element which must be established is Hunt's knowledge of the contractual relationship.  As is discussed on pages 8, 9, 11, and 12, above, CRST notified Hunt in writing of its contractual arrangements with its drivers in the fall of 2003, at or shortly after the time CRST started requiring its student drivers to sign employment contracts.  Then, in those instances in which, as required by federal regulations, Hunt made inquiry to CRST as to the driving record of a Hunt recruit, CRST consistently responded by notifying Hunt of the existence of the contract with the provision for a fixed primary term of employment.  *See* page 12, above.  Under the circumstances now before the court, this level of general and specific notification by CRST to Hunt is sufficient.  The only way CRST could have provided more pointed and specific notification to Hunt would have been for CRST to have sent individualized notice to Hunt at the inception of each student driver's training process.

---

[8]  Hunt asserts that the non-compete provisions of the driver contracts are unenforceable (Hunt brief, at 22 - 27) and that the relief sought by CRST should be denied because CRST merely seeks in this action to do indirectly that (enforce the non-compete clauses) which it could not, under applicable state law, do directly.  *Id.* at 22 - 23.  This is a red herring.  The court's determination of CRST's rights vis-a-vis Hunt, under Arkansas interference law, predicated on the primary term provisions of the driver contracts, presents issues which are entirely distinct from any issues as to the enforceability of the non-compete clauses.  CRST does not seek the aid of this court in enforcing the non-compete clauses, and CRST's satisfaction of the first of the four Walt Bennett Ford elements (see p. 26, above) is not dependent on the enforceability of those provisions.

[9]  Although this is not a dispositive point for present purposes, it should be noted that the defendant in an interference case does not have an entirely free hand in his critique of the validity of the plaintiff's contract with a third party.  As noted by the Restatement, even where the third party (in this case, the driver under contract) is in a position to attack the agreement on the basis of lack of mutuality, unconscionable provisions, conditions precedent or otherwise, the "defendant actor is not, however, for that reason, free to interfere with the performance of the contract before it is avoided."  Restatement (Second) of Torts § 766 cmt. f (1979).  Moreover, as has been noted, a contract terminable at will is still, for purposes of Restatement § 766, a contract until it has been terminated.  *Id.* at cmt. g.

That would have been self-defeating.  Once CRST put Hunt on notice of the facts, it was for Hunt, not CRST, to reach any necessary legal conclusions: "[I]t is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract.  If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have."  Restatement (Second) of Torts § 766 cmt. i (1979).

The third essential element is two-pronged.  There must be intentional interference and it must cause a breach or termination of the relationship.  In <u>Stewart Title</u>, the Arkansas Supreme Court, citing <u>Miller v. Ensco, Inc.</u>, 692 S.W.2d 615 (Ark. 1985), stated that "intentional torts involve consequences which the actor believes are substantially certain to follow his actions."  <u>Stewart</u>, ___ S.W.3d at ___ (publication pages and star page references not available).  *See also,* <u>Baptist Health</u>, ___ S.W.3d ___, 2006 WL 242670, Part III (C) (Ark. Feb. 2, 2006) (publication pages and star page references not available).  This echos the Restatement:

> [The rule stated in § 766] applies also to intentional interference, as that term is defined in § 8A, in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action.  The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.

Restatement (Second) of Torts § 766 cmt. j (1979).

Hunt argues that CRST has failed to show "that J.B. Hunt's conduct caused CRST's drivers to leave jobs that they would not otherwise have quit or change jobs they would not otherwise have changed."  Hunt brief, at 21.  As to this contention, which is essentially a "but for" causation argument, Hunt's solicitation and hiring of

hundreds of CRST drivers during their primary term of employment leaves little room for doubt that Hunt has caused CRST drivers to leave jobs that they would not otherwise have quit.  On this point, this case does not, by its nature, obligate CRST to show that every one of the drivers who have left CRST during their primary term to accept employment with Hunt have left jobs "that they would not otherwise have quit."  The natural inference from the strong evidence before the court as to Hunt's highly developed recruiting program, its systematic solicitation of CRST drivers, and the success of those efforts, leads the court quite easily to the conclusion that numerous CRST drivers have, as a result of Hunt's successful efforts, left jobs "that they would not otherwise have quit."  Acceptance of Hunt's contention on this point would require the court to assume that Hunt's impressive and highly organized recruiting program is ineffectual and that the CRST drivers Hunt solicited and hired were so disaffected that they would have left even without Hunt's recruiting.  The evidence does not support that inference.

Hunt, having been informed both generally and on an individualized basis of CRST's driver contracts, proceeded to recruit and hire CRST drivers during the primary terms of their contracts in order to satisfy Hunt's need for qualified drivers. Credible testimony, discussed on page 12, above, establishes to the satisfaction of the court that Hunt's recruiters focused on CRST drivers in particular.  There was an understandable reason for that focus.  The lower per-mile rates which were paid by CRST during the primary term of the driver contracts (for the purpose of enabling CRST to recoup some of its training outlays) increased the likelihood that pay would be, in the words of Hunt's recruiting manual, a "hot button."  CRST ex. 10, at 9. However, on the evidence before the court, there is no need for CRST to establish that its drivers were singled out by Hunt recruiters.  On the issue of intent and causation, it is sufficient to show, as CRST has done here, that the successful recruiting and

hiring of hundreds of CRST primary term drivers, with full knowledge of the driver contracts, was the natural and probable consequence of Hunt's recruiting policy, as forcefully articulated by Mr. Harper, and of the implementation of that policy as set forth in Hunt's comprehensive recruiting manual.  Hunt's inducement of CRST drivers is intentional and it has caused numerous CRST drivers to breach their contracts.[10]

As has been discussed, it is not sufficient for CRST simply to prove the four elements which were articulated in the Walt Bennett Ford case and repeated in Mason v. Wal-Mart, as discussed on page 26, above.  CRST must establish that the interference was "improper."  Mason, 969 S.W.2d at 164.  The court, in Mason, expressly adopted the factors set forth in § 767 of Restatement (Second) of Torts to govern the determination of whether the defendant's interference was improper, an approach which was reiterated ten days ago in Baptist Health, ___ S.W.3d ___, 2006 WL 242670, Part III (D) (Ark. Feb. 2, 2006) (publication pages and star page references not available).  Restatement § 767 states as follows:

Factors in Determining Whether Interference is Improper

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a)    the nature of the actor's conduct,

_____

[10]  In the Iowa case (see n. 6, above), the court found that CRST had "failed to introduce evidence sufficient to establish that J. B. Hunt engaged in intentional and improper interference with CRST's contracts with any of its drivers.  J.B. Hunt has a legitimate business interest in hiring drivers and CRST failed to introduce evidence proving that J.B. Hunt targeted or raided any CRST drivers, including the individual [defendant drivers] named in this suit.  No evidence was offered that the individual defendants left CRST at the urging of J.B. Hunt or that the individual defendants were hired as drivers by J.B. Hunt." Iowa order, op. cit. at 8.  This shortcoming in CRST's evidence was fatal to CRST's application for a temporary restraining order in the Iowa case.  In the case at bar, CRST's showing does not suffer from these deficiencies.

(b)    the actor's motive,

(c)    the interests of the other with which the actor's conduct interferes,

(d)    the interests sought to be advanced by the actor,

(e)    the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f)    the proximity or remoteness of the actor's conduct to the interference, and

(g)    the relations between the parties.

Improper interference is more readily to be found if the interest interfered with "involved persuading the third party to commit a breach of an existing contract . . . ." Restatement (Second) of Torts § 767 cmt. e (1979).  Judge Morris Arnold (an experienced Arkansas lawyer, law professor and trial judge before he went to the Eighth Circuit) commented as follows, citing comment e, in a case involving Arkansas law: "[I]nducing a breach of contract absent compelling justification is, in and of itself, improper."  Mathis v. Liu, 276 F.3d 1027, 1030 (8th Cir. 2002).[11]

Before proceeding with application of the Restatement § 767 factors to the facts of the case at bar, one matter should be addressed directly.  Hunt asserts, Hunt brief at 10, that "an act is generally only improper if it involves acts that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." For this proposition, Hunt cites three cases, one of which involves Missouri law and two of which involve the law of South Carolina.  Hensen v. Truman Medical Ctr. Inc., 62 S.W.3d 549, 555 (Mo. Ct. App. 2001); Waldrep Bros. Beauty Supply, Inc. v. Wynn

---

[11]  This passage from comment e was also quoted with approval by the Court of Appeals of Arkansas in Hayes v. Advanced Towing Services, Inc., 40 S.W.3d 800, 803 (Ark. App. 2001).  The Arkansas appellate court also went on to quote from comment f to § 767, including the following commentary:  "If the interest of the other has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the actor's own interest in taking that established right from him."  Id.

Beauty Supply Co., Inc., 992 F.2d 59, 63 (4th Cir. 1993); Charles v. Texas Co., 192 S.C. 82, 5 S.E.2d 464, 472 (1939).  It was made clear in Mason, 969 S.W.2d at 165 and again earlier this month in Baptist Health, ___ S.W.3d ___, 2006 WL 242670 (Ark. Feb. 2, 2006), Part III (D), n. 4 (publication pages and star page references not available) that Arkansas explicitly rejects any such requirement.  *See also,*  Hayes, 40 S.W.3d at 804 and Mathis, 276 F.3d at 1030.

The Arkansas appellate court, in Hayes, took to heart the Arkansas Supreme Court's adoption, in Mason, of the Restatement § 767 factors.  In Hayes, the Arkansas appellate court carefully analyzed and applied each of the § 767 factors to the facts then before it.  *See* Hayes, 40 S.W.3d at 802 - 805.  This court will do likewise.

The nature of the actor's conduct.  Hunt's driver recruiting program is not intrinsically improper, let alone unlawful.  Hunt is perfectly entitled to choose, as it has, to recruit drivers who already have their training, their commercial driver's license, and a modicum of long-haul driving experience.  Likewise, Hunt's aggressive implementation of its driver recruiting policies is the product of Hunt's business needs, and is not inherently wrong.  The court is not critical of Hunt's recruiting approach except to the extent that the matter takes on a different coloration when viewed in light of CRST's legitimate and protected contractual interests which were made known to Hunt.  Otherwise stated, Hunt's corporate decision to recruit almost entirely in the "free agent" market is unobjectionable except to the extent that those recruiting efforts are directed to individuals who are known, or should be known, to Hunt not to be free agents.  That aspect of the matter is discussed below.

The actor's motive.  The primary motivation for Hunt's driver recruiting program, and for the practices which implement that program, is to get new drivers driving for Hunt.  The court draws no inference from the evidence, and CRST does

not suggest, that Hunt recruits drivers who are under contract with CRST for the purpose of putting CRST in an unfavorable competitive position.

The interests of the other with which the actor's conduct interferes. The interests with which Hunt has interfered are substantial. Hunt and CRST have chosen two fundamentally different approaches to getting new drivers. CRST is as entitled to pursue its new driver training strategy as Hunt is to pursue its strategy of recruiting drivers who are already trained and licensed and have some experience. The implementation of CRST's new driver training strategy necessarily requires that CRST have some means, in this case contractual means, of protecting its substantial investment in new driver training. CRST has sought to accomplish this by way of the driver contracts, and the court has found that the driver contracts validly provide for a fixed primary term of employment. CRST has adopted a lawful means for accomplishing a lawful business objective. CRST has a substantial interest in insuring the integrity of its driver contracts as an important component of its new driver recruiting and training strategy.

The interests sought to be advanced by the actor. Hunt seeks primarily to advance its legitimate interest in hiring new drivers. Hunt has this interest in common with every other long-haul trucking company, including CRST.

The social interests in protecting the freedom of action of the actor and the contractual interests of the other. Hunt's interest in unencumbered access to the entire pool of safe, qualified drivers, as was vividly described by Mr. Harper, reflects society's general interest in the freedom of prospective employers to hire, and the freedom of prospective employees to hold themselves out for hire, without undue impediments. Thus, the court does not lightly dismiss Hunt's desire to have recruiting access to every safe, qualified driver who might want to make a change. On the other hand, there is an important social interest in providing the protection of contract and

33

tort law for CRST's selection of lawful means to accomplish its own lawful business objectives.  Moreover, at a time of serious and chronic driver shortages, there is a social interest in protecting the lawful means by which industry competitors, such as CRST, have implemented driver development and training programs which enlarge the pool of available drivers and make attractive training and employment opportunities available to individuals who could not otherwise afford to pay the cost of entry into the pool of available long-haul drivers.

The proximity of remoteness of the actor's conduct to the interference.  There is nothing remote about Hunt's recruitment of CRST's contract drivers or about the impact on CRST's driver contracts of Hunt's chosen recruiting strategy.  Hunt's recruiting practices directly affect CRST's contractual relations with its drivers; the impact of the hiring of a CRST driver known to Hunt to be within the primary term of his CRST driver contract is well known to both parties.

The relations between the parties.  The only relevant relationship between Hunt and CRST is that they are competitors in the labor market.  That implicates three interests which already have been discussed, *viz.* society's interest in free labor markets, society's interest in protecting lawful contractual arrangements, and society's interest in alleviating the shortage of qualified drivers by providing new opportunities to those who are untrained and inexperienced.

—————————————————————————

After the court, in Hayes, worked its way through the Restatement § 767 factors, the court opined that "the foregoing factors do not lead to an obvious conclusion."  Hayes, 40 S.W.3d at 804.  Quoting from comment j to § 767, the court said that the issue resolved itself into the question of whether "the actor's conduct was fair and reasonable under the circumstances."  *Id.* at 804-05.  Comment j explains this

final analytical step, which may or may not be necessary in any particular case, as follows:

> When no crystalized pattern is applicable, however, the balancing process must be followed for the individual case. Though consideration must be given to the factors stated in this Section, generalizations utilizing a standard are sometimes offered. Thus, it has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances. Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not "sanctioned by the 'rules of the game.'" The determination is whether the actor's interference is "improper" or not. But an attempt to apply these broad, general standards is materially helped by breaking the conflicting elements into the factors stated in this Section.

Restatement (Second) of Torts § 767 cmt. j (1979).

In the case at bar, the "fair and reasonable under the circumstances" overlay on the § 767 analysis is not a necessary prerequisite to reaching a conclusion as to whether Hunt's interfering conduct was "improper" in the relevant sense. The court concludes that it was improper. As has been discussed, the fact that Hunt's interference was with valid, existing contracts gives CRST a significant head start.[12]

Hunt can rightly point to its interest, and society's interest, in free labor markets. Arrayed against that interest are CRST's interest in protecting its lawful recruiting and training strategy, society's interest in expanding the pool of workers who have skills which are clearly in short supply, and society's interest in the

---

[12] Hunt suggests, in discussing choice of law, that the interference law of Arkansas is not as "stable and well developed" as Iowa's law. Hunt brief, at 4. This court is persuaded, on the basis of its careful examination of Arkansas interference law, that the Arkansas cases leave nothing to be desired in terms of clarity. The Arkansas courts' reliance on the relevant sections of the Restatement of Torts is especially helpful.

"sanctity of contracts."   Sheet Metal Workers Intern. Ass'n. v. E. W. Daniels Plumbing & Heating Co., 264 S.W.2d 597, 601 (Ark. 1954).

Taking into account the clarity of the interests sought to be protected, the quality of the knowledge conveyed by CRST to Hunt about those interests, and the direct impact which Hunt's practices have had on CRST's contractual relations with its drivers, the court concludes, applying the Restatement § 767 factors, that Hunt's interference with CRST's drivers contracts was improper.

Having applied the standards established by the Arkansas cases, the court concludes that CRST has established that it has a substantial likelihood of prevailing on the merits of its interference claim.[13]

### 2.    Irreparable harm.

The harm to CRST which results from Hunt's recruiting practices is certain, but exceptionally difficult to measure.  The loss resulting from the idling of a significant number of CRST's trucks consists of more than just lost freight revenues.  There is a loss of good will with a resultant potential for loss of customers.  Moreover, the cost associated with the loss of a driver during the primary term of his driver contract cannot be reckoned simply by looking to the dollar amount the contract requires to be reimbursed in the event of failure to complete the primary term of employment.  That dollar amount does not cover the actual cost of training a driver.  The number of

---

[13] Only brief mention is necessary as to one other contention in Hunt's brief.  Hunt asserts that, under Arkansas law, the plaintiff in an interference case must overcome a "privilege to compete."  Hunt brief, at 11.  The authorities cited by Hunt, including Restatement (Second) of Torts § 768, deal only with *business expectancies*, as distinguished from existing contracts.  Restatement § 767 makes it unmistakably clear that, as to existing contracts, the determination of whether the interference was "improper" covers all of the ground that would otherwise be covered by an analysis in terms of "privilege."  Restatement (Second) of Torts, § 767 cmt. b (1979).  Nothing in Mason v. Wal-Mart or its progeny (Hayes, decided in 2001; Stewart, decided in 2005, and Baptist Health, decided this month) supports any suggestion that where an *existing* contract has been found to have been *improperly* interfered with (using the Restatement § 767 analysis), an additional analysis, in terms of privilege, is required.

drivers who progress to the point of performing as "finished" over the road drivers substantially exceeds the number of individuals in whom CRST makes the training investment. There is another interest at stake here which is less tangible but no less important. CRST is entitled to pursue its chosen new driver recruitment and training strategy without having to file a new damage suit from time to time to seek recompense for improper interference with that strategy. In this respect, injunctive relief may be precisely tailored to the legal wrong which has been established and can effectively prevent the certain-to-occur but unmeasurable damage to CRST's freedom to adopt and implement a lawful recruitment and training strategy.

The palpable shortcomings of CRST's remedies at law lead the court to the conclusion that CRST will suffer irreparable harm if a preliminary injunction is not entered.

    3.    <u>Injury to CRST vs. injury to Hunt</u>.

The legitimate interests advanced by Hunt and CRST in this case have already been discussed. *See* pages 33 and 34, above. Viewing the matter in the abstract, those interests, on both sides, are weighty. However, as a practical matter, the harm which CRST will suffer as a result of unobstructed interference by Hunt with CRST's driver contracts substantially exceeds the harm – which could almost be characterized as a mere inconvenience – which will be inflicted on Hunt if Hunt's recruiters, in making their 80,000 recruiting calls per week, are precluded from recruiting and hiring CRST drivers before they complete their primary term of employment. The balance of harm clearly favors CRST.

    4.    <u>The public interest</u>.

The court's analysis of the public interests at stake is adequately discussed on page 34, above. The public interest in free labor markets is not trifling; however, in the circumstances of this case, the public interest in protection of legitimate

contractual arrangements, combined with the public interest in alleviating a serious and chronic driver shortage by bringing new drivers into the available pool (including many who would not otherwise have the opportunity to improve their lot) outweighs the negligible impairment of the free labor market which would result from requiring Hunt to refrain from hiring drivers it knows, or should know, are within their primary term of employment with CRST. The public interest favors the granting of a preliminary injunction.

       E.    Scope of preliminary injunctive relief.

Unless enjoined from doing so, Hunt will continue to recruit and hire CRST contract drivers known to Hunt to be within the primary term of their employment with CRST. Injunctive relief is required, but the injunction must not prohibit lawful activity – which includes aggressive recruiting of CRST drivers for hire after the completion of their contractual term of employment. Injunctive relief should not tread on the freedom of Hunt to make and implement business decisions except as is clearly necessary to prevent Hunt's ongoing tortious conduct. The injunctive order should be clear enough to establish a bright line between permissible and prohibited conduct,[14] yet "not so narrow as to invite easy evasion." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949).

CRST's motion for preliminary injunction is **GRANTED**. Concurrently with entry of this order, the court enters an injunctive order which comports with the requirements of Rule 65, Fed. R. Civ. P. and intrudes no further into Hunt's business than has clearly been shown to be necessary. As stated in the injunctive order, security shall be required in the amount of $200,000, a sum which should be sufficient

---

[14] As to the "reasonable cause to believe" language in the injunctive order, see United States v. Saffo, 227 F.3d 1260, 1267 - 69 (10th Cir. 2000).

to provide recompense to Hunt for its "costs and damages," Rule 65 (c), if Hunt is found to have been wrongfully enjoined.

DATED February 14, 2006.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

04-0651p034  (pub).wpd