**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CRST VAN EXPEDITED, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-04-0651-F |
| | ) | |
| J.B. HUNT TRANSPORT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION IN LIMINE
TO EXCLUDE EXPERT TESTIMONY**

By motion filed on May 2, 2006 (doc. no. 191, herein "Motion") defendant J.B. Hunt Transport, Inc. (the only remaining defendant in this case) seeks to exclude the testimony of Kristofer K. Swanson, a consultant retained by plaintiff CRST Van Expedited, Inc. for the purpose of testifying as an expert on damages at the trial of this action.  Plaintiff responded to the motion on May 19, 2006 (doc. no. 218, herein "Response"), and, after a hearing which was held on June 2, 2006, defendant filed a supplemental brief in support of its motion on June 6, 2006 (doc. no. 240, herein "Supplement"), to which plaintiff responded on June 9, 2006 (doc. no. 246, herein "Supp. Response").  By this order, the Motion is **GRANTED** in part, and **DENIED** in part, for the reasons stated below.

A.  The Court's Daubert/Kumho Gatekeeper Function

The Supreme Court's decisions in <u>Daubert v. Merrell Dow Pharmaceutical, Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Company, Ltd. v. Carmichael</u>, 526 U.S. 137 (1999) establish a "gatekeeper" function for trial judges under Fed.R.Evid.

702. *See also,* Goebel v. Denver and Rio Grande Western Railroad Company, 215 F.3d 1083, at 1087 (10th Cir. 2000). The gatekeeper function "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts." Goebel at 1087.

The question of *how* to perform its gatekeeping function is a discretionary matter for the trial court. The court may conduct a hearing, it may perform its gatekeeping obligation by ruling on a motion in limine or on an objection at trial, or even by ruling on a post-trial motion. *Id.* When faced with a Daubert/Kumho objection to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper. Goebel at 1088.

Even though the court may delve deeply into the minutiae of the proposed expert's opinions while conducting the Daubert/Kumho analysis, the court must always remain mindful that its focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert at 595. Thus, the ultimate objective of Daubert scrutiny is to ascertain whether the proffered expert testimony is "not only relevant, but reliable," Daubert at 589, and it must be emphasized that the evaluation for reliability cannot be permitted to evolve into an assessment of the ultimate persuasiveness of the proffered expert testimony.

One of the most important aspects of the relevance evaluation is the question of "fit." In assessing "fit," the court must determine whether the "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert at 591 [internal quotation marks omitted]. In explaining the 2000 amendment to Rule 702, the Advisory Committee expressed the "fit" requirement by stating that "the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case."

In <u>Kumho</u> the Court elaborated upon the <u>Daubert</u> gatekeeping function as applied to proposed expert testimony other than classical scientific testimony. The Court emphasized that, even where the proposed expert testimony is not scientific in nature, in the classical sense, the trial judge is nevertheless required to ascertain whether the expert "employs in the courtroom the same level of *intellectual rigor* that characterizes the practice of an expert in the relevant field." <u>Kumho</u>, 526 U.S. at 152 (emphasis added).

When the proposed testimony of an expert is challenged under <u>Daubert</u> and its progeny, Rule 104 of the Federal Rules of Evidence applies to the court's consideration and determination of the issues raised by the Daubert challenge. <u>Daubert</u>, at 592, n. 10. Rule 104(a) casts upon the proponent of the testimony (in this case, CRST) the burden of establishing the admissibility of the testimony by a preponderance of the evidence. <u>Daubert</u>, *id. See also*, the Advisory Committee notes to the 2000 Amendments to Rule 702 ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). It is in that light, and with that burden[1] in mind, that the court examines Mr. Swanson's proposed expert testimony and CRST's response to the present motion.

It is clear that, in our circuit, the <u>Daubert/Kumho</u> gatekeeping function is undertaken by means of a two-step analysis. <u>Ralston v. Smith & Nephew Richards, Inc</u>*., 275 F.3d 965, at 969 (10th Cir. 2001). *First,* the court must determine whether the proposed expert is *qualified.* This requires an assessment of his "knowledge, skill, experience, training or education." See Rule 702 and

---

[1] CRST's burden may not be an *evidentiary* burden in the strict sense, but it is clear that, under Rule 104(a), it falls to the proponent to establish, and not to the opponent to refute, the admissibility of the evidence proffered by the proponent. *See, e.g.,* United States v. Cherry, 217 F.3d 811, 815 (10th Cir. 2000) and United States v. Metropolitan Enterprises, Inc. 728 F.2d 444, 448-49 (10th Cir. 1984).

Ralston at 969.  In <u>Gardner v. General Motors Corporation</u>, 507 F.2d 525 (10th Cir. 1974), our Court of Appeals noted that a proposed expert "should not be required to satisfy an overly narrow test of his own qualification."  507 F.2d at 528.  Even though <u>Gardner</u> was a pre-<u>Daubert</u> decision, that admonition from the Court of Appeals is still relevant.  *Secondly,* if the proposed expert is determined to be sufficiently qualified, the court must determine whether his or her opinions are "reliable" in the sense required by <u>Daubert</u> and <u>Kumho</u>.  <u>Ralston</u> at 969.

The <u>Daubert</u> case, of course, involved a proffer of expert testimony in a classical scientific discipline--epidemiology.  Bearing that context in mind, it is nevertheless appropriate to review the non-exclusive list of five factors which were provided by the <u>Daubert</u> court.  The Court, in <u>Daubert</u>, said that the trial judge should (1) assess whether the expert's technique or theory can be or has been tested--that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability, (2) determine whether the technique or theory has been subject to peer review and publication, (3) evaluate the known or potential rate of error of the technique or theory when applied, (4) ascertain the existence and maintenance of standards and controls and, (5) determine whether the technique or theory has been generally accepted in the scientific community.  *See* 509 U.S. at 590-594.

The decision in <u>Kumho</u> made it clear that the gatekeeper function applies even where the proposed expert testimony is outside the realm of science in the classical sense.  <u>Kumho</u> involved a proffer of engineering testimony in a product liability case.  The <u>Kumho</u> decision makes it clear that, although the ultimate task of the trial judge, as gatekeeper, remains the same, the factors which were included in the nonexclusive list in <u>Daubert</u> are to be used only to the extent that they are logically applicable.  *See* <u>Kumho</u>, 526 U.S. at 149.  Thus, for instance, it has been

4

noted that the factors mentioned by the Court in <u>Daubert</u> do not neatly apply to expert testimony from a sociologist, <u>Tyus v. Urban Search Management</u>, 102 F.3d 256 (7th Cir. 1996), and that lack of peer review or publication is not dispositive where the expert's opinion is supported by "widely accepted scientific knowledge." <u>Kannankeril v. Terminix International, Inc.</u>, 128 F.3d 802 at 809 (3rd Cir. 1997). Moreover, as noted by the Advisory Committee in commenting on the 2000 amendments to Rule 702, courts both before and after <u>Daubert</u> have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the jury. Those additional factors which may be relevant depending on the circumstances include (1) whether the expert proposes to testify about matters growing naturally and directly out of his research, independent of the litigation, or whether he has developed his opinion expressly for the purpose of testifying, (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *See* Advisory Committee notes to 2002 amendments, and cases there cited.

## B.  Kristofer Swanson's Damage Computation Method

In his Rule 26 report (Appendix to Defense's Motion, Vol. I, herein "Report"), Mr. Swanson presents his method for computing the damages resulting from Hunt's alleged interference. Mr. Swanson begins with the reasonable assumption that when Hunt hires a CRST driver by means which amount to tortious interference with CRST's contract with the driver, CRST loses profit in an amount proportional to the length of time that the driver would otherwise have worked for CRST. Mr. Swanson then scrutinized CRST employment data from

2002 and 2003.  Mr. Swanson concludes that: (1) a CRST driver employed for at least three months continued for, on average, an additional eight months, or eleven months total, and (2) a CRST driver who worked for at least six months stayed an average of eight additional months, or fourteen months total.  Report at 8-9. Conclusions (1) and (2) serve as the bases for Mr. Swanson's two separate damage categories, designated "Contract Term" and "Post-Contract Term," respectively. *Id.*

In creating the Contract Term category, Mr. Swanson assumes that "Hunt typically recruited drivers during the period in suit who had, on average, more than 3 months of experience ...." *Id.* at 9.  Similarly, Mr. Swanson apparently premises the existence of the Post-Contract category upon the fact that, "but for" Hunt's interference, the disputed drivers would have fulfilled their original six-month commitments, and would have stayed on in accordance with the statistical prediction of Conclusion (2) above. *Id.* at 10.  Mr. Swanson then presents damage totals obtained by multiplying the "lost driver days" in each category by the estimated per-day profit that the lost driver would have produced.[2] *Id.* at 8.

### C.  Hunt's Arguments and Analysis

A threshold argument which may quickly be turned aside is Hunt's contention that Mr. Swanson is unqualified to offer the statistical analysis contained in his Report.  Motion at 15.  Mr. Swanson's analysis – namely, the use of averaging to facilitate the drawing of inferences from past behavior involving repetitive events, and to predict future behavior – is a common business technique that is well within the scope of Mr. Swanson's education and expertise.  Although the court may ultimately take issue with how this method is proposed to be applied to the calculation of plaintiff's damages, the court nevertheless concludes that Mr. Swanson is qualified to offer it.

---

[2] Hunt has not disputed Mr. Swanson's method of calculating the per-day profit.  Consequently, that aspect of Mr. Swanson's methodology is not addressed here.

Hunt next objects to Mr. Swanson's use of "weighted averages" to predict employment periods for CRST drivers. Motion at 7. Noting that, for example, Swanson reports a weighted average duration of employment of 11.49 months for drivers who were hired by CRST in January 2002 and who stayed for at least three months, Hunt complains that "[i]t is impossible to conclude rationally from the data presented in Swanson's Exhibit 910, that this 'weighted average length of service' for these 2,247 drivers of more than 11 months could be valid when two-thirds of the drivers are shown to have been gone before that time." *Id.* at 7 (emphasis omitted). This statement is mathematically incoherent. It is a natural and accepted property of statistics that, in a given data set for which a mean (average) value has been calculated, some data values may be (and usually are) smaller than the mean, some may be (and usually are) greater.[3] Further, a disparity between the number of data values which are greater than the mean, versus the number that are smaller is neither arithmetically prohibited nor particularly surprising.[4] Given that Hunt does not take issue with the raw data used, the court concludes that the weighted averages used by Mr. Swanson are not invalid per se.

Hunt next argues under <u>Daubert</u> that Mr. Swanson's testimony lacks sufficient "fit" to the facts of this case to aid the jury in resolving a factual dispute. Motion at 18. By failing to address possible alternative explanations for driver departures from CRST, Hunt concludes that Mr. Swanson's testimony is so detached from the facts of this case as to be unhelpful to the jury. <u>Daubert</u>, 509 U.S. at 591. This argument misconstrues the scope of Mr. Swanson's testimony,

---

[3] *See, generally,* David H. Kaye and David A. Freedman, <u>Reference Guide on Statistics</u>, *in* <u>Reference Manual on Scientific Evidence</u> (Federal Judicial Center, 2d ed. 2000) at 113-14.

[4] A check of Mr. Swanson's calculations of average length of service for drivers hired during the months of January 2002, September 2002, and June 2003 shows them to be arithmetically correct. *See* Report, Exhibit 1, Schedule 910.

which relates only to damage calculation, not to causation.[5]   For the purpose of presenting his damage calculation methods, Mr. Swanson is entitled to presume causation (a prerequisite to recovery which will have to be established by evidence other than Mr. Swanson's testimony).    Hunt further asserts that Mr. Swanson improperly and prejudicially suggests that his damage calculations support CRST's theories of liability and causation.   Supplement at 8.   This argument is similarly unavailing.    As a damage expert, Mr. Swanson is entitled to show that his calculations are consistent with CRST's theory of causation.   Hunt's imputation of an improper purpose is unfounded.   Mr. Swanson's engagement did not extend – and his trial testimony will likewise not extend – to establishing causation as a factual matter.

Hunt next contends that Swanson's testimony ignores the effect of the mitigatory steps that CRST could have taken in response to Hunt's alleged improper actions.   Motion at 18.   CRST responds that it had no duty to mitigate the damages allegedly resulting from Hunt's interference by hiring "*even more* drivers for Hunt to try to recruit away," Response, at 14 (emphasis in original) or by radically changing its chosen business model.   Id.   The court agrees, at least for the present purpose of determining whether Mr. Swanson's methodology is impermissibly flawed.   (Jury instructions are another matter.   It seems likely that, for a number of reasons, an instruction on CRST's duty to mitigate will be appropriate.)

Hunt next takes issue with Mr. Swanson's use of the three-month experience baseline in calculating his Contract Term damages.    Motion at 7.    Mr. Swanson justifies this assumption based on his observation that "Hunt typically recruited drivers during the period in suit who had, on average, more than 3 months of experience."   Report at 9.   Mr. Swanson arrived at his three-month figure by

---

[5] The court acknowledges that Mr. Swanson's repeated use of the causation term "but for," tends to confuse the purpose of his testimony.

analyzing the records of 189 drivers assumed to have been hired away by Hunt in 2002 and 2003, finding that the average driver had worked for approximately 96 days before leaving CRST.   Report, Exhibit 1, Schedule 510.   Although mathematically correct, the court cannot agree that this 96-day average supports Mr. Swanson's use of the three-month baseline to predict an overall tenure of eleven months for *all* drivers in the disputed group.   A cursory check of the data contained in Schedule 510 shows (unsurprisingly) that ninety-two of the 189 drivers worked for CRST for less than the 96-day average.   Mr. Swanson's calculation treats each of these ninety-two drivers as if they had worked for CRST for a minimum of three months, regardless of how long they had actually stayed.

CRST responds by arguing that this "rounding up" effect is counterbalanced by the number of drivers in the group who stayed with CRST for longer than three months.   While the court has acknowledged the tendency of a data set to have values both above and below its mean (see pp. 7-8, above), this argument misses the point here.   The problem is the use of the mean, without apparent mathematical justification, as a basis for further calculation.   Mr. Swanson proposes to collapse a disparate set of numerical values into an average representing a single point in time, from which he then extrapolates a prediction that is applied to all members of the disputed group to produce a lost profit estimate. The court does not find, in the Report or elsewhere, adequate support for the use of this static three-month figure as a baseline for projecting the employment longevity of all drivers in the Contract Term category, to the exclusion of more conventional statistical techniques such as linear regression.[6]   In the face of Hunt's challenge (a challenge which is most cogently articulated at pp. 4-6 of Hunt's Supplement), CRST has shown no extrinsic support, from peer review, professional literature, or other indicia of general acceptance, for Mr. Swanson's approach.

---

[6] *See, generally*, <u>Reference Guide on Statistics</u>, *supra* note 2*, at 139-41.

CRST advances two other arguments in support of Mr. Swanson's Contract Term approach. First, it points to deposition testimony by Hunt executive Craig Harper and expert witness Cheryl Shuffield. Response at 14, Supp. Response at 3. As to the issues now before the court, these statements are less than compelling. In the case of Mr. Harper, his description of Hunt's three-month minimum experience requirement for new hires appears to be nothing more than a statement of Hunt's current recruiting policy. This policy is not perceptibly connected to the drivers studied by Mr. Swanson, as evidenced by the fact that a significant portion of that group had less than three months of experience. Similarly, Ms. Shuffield's statement, expressing a lack of objection to Mr. Swanson's "in for three months, in for eleven months" statistic, does not undermine Hunt's position. As noted earlier, it is Mr. Swanson's application of this statistic to the group average, not the statistic itself, that is problematic here.

Finally, CRST asserts that Hunt has not offered its own statistical analysis refuting Mr. Swanson's use of the three-month average. Supp. Response at 2. Though true, this statement misconceives the court's responsibility under <u>Daubert</u> and <u>Kumho</u>.[7] As is discussed above, the court's task as the gatekeeper is to carefully assess, albeit not with too fine a screen, the adequacy of the methods employed by the expert whose work is challenged. The burden of establishing the admissibility of the proposed expert testimony lies with the proponent. It is neither the responsibility of the defendant nor of this court to propose alternatives to the method at issue. Mr. Swanson's use of the three-month experience baseline undermines the calculations that are premised on that baseline. In response to defendant's challenge, CRST has, as noted, provided no extrinsic support for this aspect of Mr. Swanson's methodology. Applying the principles established by

---

[7] The court's analysis of the present motion is not affected by any of the matters complained of in Hunt's Motion to Direct Plaintiff to Correct its Supplemental Memorandum (doc. no. 248). That motion will accordingly be denied.

<u>Daubert</u> and <u>Kumho</u> and their progeny, the court does not find assurances of reliability in Mr. Swanson's Contract Term damage calculation sufficient to support admission of that damage calculation into evidence. Accordingly, Hunt's Motion to Exclude Testimony is hereby **GRANTED** with regard to Kristofer Swanson's Contract Term Damages calculation.

Hunt lodges a similar complaint with respect to the Post-Contract Term damage calculation, alleging that Mr. Swanson's "in for six months, in for fourteen months" assumption is based upon faulty statistical analysis. Motion at 4. Though similar to the Contract Term calculation, the Post-Contract Term calculation differs in a critical respect: Rather than using a statistically-derived average value as a basis, the Post-Contract Term category rests upon the assumption that the disputed drivers would have, absent Hunt's tortious interference, remained in the employ of CRST for the entirety of their six-month contracts. The common problem for each category is thus one of assumptions; instead of using a dubious average, the Post-Contract Term category rests upon the equally dubious premise that CRST's driver employment contracts would have, absent Hunt's interference, proven one-hundred percent successful in retaining drivers.[8]

CRST argues that the Restatement (Second) of Torts § 774A supports Mr. Swanson's one hundred percent assumption, claiming that it "is entitled as a matter of law to seek damages from Hunt based on the performance due from each driver on that driver's remaining contract term." Response at 10 (emphasis omitted). The court does not agree. The plain text of § 774A, its commentary, and the applicable case law make clear that CRST is entitled to the *reasonably expected* benefits of the breached contracts, not necessarily their aggregate value. This is consistent with the overriding policy of tort law, which is to restore the wronged party to its original position, and not to a more favorable position. In proposing a damage

---

[8] CRST's own data shows that its six-month retention rate was far below one-hundred percent after it began using the contracts.

calculation which assumes one-hundred percent contract performance, CRST seeks to obtain in court a result which it clearly could not obtain in the business arena.

Since the question of whether or not any individual driver left CRST due to Hunt's interference is an issue material to this case, the court is not inclined to exclude Mr. Swanson's Post-Contract damage calculation on a wholesale basis. The court will allow this testimony, provided that it is applied *only* to the subset of drivers[9] found by the trier of fact (1) to have been improperly hired away by Hunt; and (2) who would otherwise have completed their six-month contracts.  CRST has, in a backhanded way, indicated that it is prepared to proceed on that basis.  Supp. Response at 4.  Aside from the one-hundred percent performance assumption, the court concludes that Mr. Swanson's Post-Contract Damage Term calculation survives Hunt's challenge.

In summary, Hunt's Motion to Exclude Expert Testimony is **GRANTED** as to Kristofer Swanson's Contract Term Damages calculation, and is **DENIED** as to Kristopher Swanson's Post-Contract Term Damages calculation, subject to the mandated modifications.   Hunt's Motion to Direct Plaintiff to Correct its Supplemental Memorandum (doc. no. 248) is **DENIED**.

Dated July 24, 2006.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

04-0651p055(pub).wpd

---

[9] Individual identification of drivers is not required.  Provided that a satisfactory evidentiary foundation is laid, CRST will be permitted to establish, and the jury will be permitted to infer, the size of this subset on an aggregate basis.